IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| KAREN WIDMAN<br><br>Plaintiff,<br><br>vs.<br><br>MARILEE E. KEENE and DAVID SHELL<br><br>Defendants, | **AMENDED**[1] **MEMORANDUM DECISION:**<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br><br><br>Case No. 2:10-cv-459<br><br>Judge Clark Waddoups |

## INTRODUCTION

In February 2005, Plaintiff Karen Widman ("Widman") and Defendant David Shell ("Shell")

divorced in California. As part of their divorce, they entered into a Marital Settlement Agreement

that required Widman to make equalization payments to Shell to equalize the division of assets held

by them. Part of the equalization payments had to be made in lump sums, with the remainder to be

made under two promissory notes. After disputes arose in subsequent years about Widman's

obligations to Shell, Widman filed suit against assignee Marilee E. Keene ("Keene") and Shell

seeking declaratory relief that Widman is in compliance with the terms of the promissory notes. In

turn, Keene filed a counterclaim against Widman, which asserts Widman is in breach of the Marital

---

[1] In its prior decision, the court stated the bench trial occurred in 2007. The court amends its decision only to reflect that the bench trial occurred in 2014. No other modifications have been made.

Settlement Agreement and that Keene has the right to foreclose against certain real property owned by Widman.

A bench trial was held in this matter on April 23 through April 25, 2014. Widman was represented by Rodney W. Rivers of Jeffs & Jeffs, PC. Keene was represented by Randy M. Andrus of the Andrus Law Firm, LLC. Shell appeared *pro se*, but Shell has legal training and was formerly licensed to practice law in California where the Marital Settlement Agreement was entered. The court heard the testimony of fact witnesses, received into evidence numerous exhibits, and heard the oral arguments of the parties. Based on the evidence presented, the court enters the following findings of fact and conclusions of law.

## **FINDINGS OF FACT**

The court enters these findings of fact based on a preponderance of the evidence. In assessing the credibility of the witnesses, the court has considered the source and basis of each witness's knowledge; the strength of the witness's memory; each witness's interest, if any, in the outcome of the litigation; the relationship of each witness to either side in the case; and the extent to which each witness's testimony is either supported or contradicted by other evidence presented at trial. Throughout most of the findings below, where Shell has given testimony contrary to that of other witnesses, the court has rejected Shell's testimony and accepted the testimony of other witnesses based on these factors.

**Jurisdiction and Choice of Law**

1.    Plaintiff Karen Widman ("Widman"), a.k.a. Karen Root, is a resident of Utah County, Utah and has been during all times relevant to this dispute.

2.    Defendant David Shell ("Shell") is a resident of the State of California.

3.      Widman is Shell's former wife.

4.      Defendant Marilee E. Keene ("Keene") is a resident of the State of California.  On October 31, 2006 Shell assigned a promissory note and trust deed to Keene.  On November 17, 2006, Shell assigned another promissory note and trust deed to Keene.  Keene is appearing in this case as the assignee of those notes and trust deeds.

5.      This action was brought in the Fourth Judicial District Court for Utah County, State of Utah and removed to this court by Defendant Keene under 28 U.S.C. § § 1441 and 1446.

6.      The court has jurisdiction under 28 U.S.C. §§ 1441 and 1446 and 28 U.S.C. § 1332 (diversity).

**Procedural Background**

7.      In response to Widman's complaint, Keene answered and filed a counterclaim against Widman alleging  three claims for breach of the Marital Settlement Agreement between Shell and Widman, two additional claims for foreclosure, and a final claim for declaratory judgment.  Answer & Counterclaim (Dkt. No. 11).

8.      Shell did not answer or file any counterclaim.

9.      Trial was initially scheduled to commence in this matter on February 21, 2012.  Scheduling Order, Dkt. No. 17.  It was then reset four times for the following dates: August 20, 2012, February 11, 2013, July 22, 2013, and September 30, 2013.

10.     On September 11, 2013, Shell moved to continue the trial due to a medical procedure he was having the following day.  Shell did not explain why he waited until the day before the procedure to move for the continuance, why the medical procedure could not have been postponed,

nor why he could not be recovered by the time of trial. Based on the multiple delays and the failure to explain why the latest circumstance necessitated a continuance, the court denied the motion to continue. In its order, the court further noted that Mr. Shell had a limited role in the case because he had assigned all of his rights under the Notes and Trust Deeds to Ms. Keene before any of the alleged late payments had occurred. Order (Dkt. No. 97).

11.     By email on September 19, 2013, Shell informed the court he did have an interest in the case because Keene had reassigned to Shell the rights to both Trust Deeds and any payments due under promissory notes. The reassignment occurred on September 11, 2013—the day Shell moved for the latest trial continuance. *See* Email (Dkt. No. 99). Shell further stated in the email that he would appear for the trial.

12.     The court held a Final Pretrial Conference on September 26, 2013, during which the court reviewed the procedural history of this case and noted for the first time that Shell had never filed an answer. Shell informed the court he thought Keene's counsel had answered for him. Based on that representation and Shell's participation in the case, the court declared Shell in default, but granted him leave to file a motion to set aside default. Shell informed the court he would also file a counterclaim. Due to the untimeliness of any such counterclaim and the prejudice to Widman, the court denied Shell leave to file a counterclaim. *See* Minute Entry (Dkt. No. 105).

13.     The following day, Shell provided additional information about his medical condition and requested again that the September 30, 2013 trial be continued. Based on that new information, the court concluded a fifth continuance was appropriate and rescheduled the trial to April 23, 2014. *See* Notice of Hearing (Dkt. No. 115).

14.     On October 15, 2013, Shell filed his motion to set aside default. Despite the court's previous directive, Shell not only moved for default to be set aside, but sought to assert additional affirmative defenses and a counterclaim. On November 13, 2013, the court granted, in part, Shell's motion to set aside the default, which allowed him to file an answer. The court limited the answer, however, to the denials and defenses filed by Keene's counsel since Shell had asserted he thought Keene's counsel had also answered for him. The court then denied again Shell's request to assert new affirmative defenses or a counterclaim based on untimeliness and prejudice. Order (Dkt. No. 145).

15.     Approximately five months later and three weeks before trial, on April 1, 2014, Shell moved again to file a counterclaim. He asserted that on January 22, 2014, he had filed a complaint against Widman based on the marital settlement agreement because the court had previously denied him leave to file a counterclaim. He argued that the issues presented in the Complaint should be considered his counterclaim in this matter. Motion for Leave to File Cross-Complain (Dkt. No. 121).

16.     On that same date, Shell also filed a motion for the court to reconsider its November 13, 2013 ruling wherein the court limited Shell's answer to those admissions and denials stated by Keene in her answer. Motion to Reconsider (Dkt. No. 119).

17.     Then, nine days before trial and four years into this litigation, Shell moved to be substituted as a party in place of Keene as a counterclaim plaintiff because on April 10, 2014 Keene had assigned her counterclaim in this matter to Shell. Notice of Motion to Substitute (Dkt. No. 133). Shell attached the assignment to his motion. *See id.*

18.     On April 22, 2014, the court granted Shell's motion to reconsider, which allowed him

to admit or deny for himself the allegations in the complaint. Then, for a third time, the court denied Shell leave to file any new affirmative defenses or a counterclaim. The court likewise denied Shell's motion to be substituted in place of Keene, but stated that if proper evidence was submitted at trial, the court would take the assignment into account when making its decision. Minute Entry (Dkt. No. 146).

19.     Trial commenced the following day and Shell filed his Answer on that same date. Shell's Answer (Dkt. No. 147).

20.     After reviewing the Answer, the court concluded Shell had, contrary to the court's order, asserted new affirmative defenses and a counterclaim as part of his admissions and denials. The court therefore struck those portions of the Answer. *See* Trial Tr. at 212–18 (Dkt. No. 160). Additionally, Shell failed to admit, deny, or fairly respond to certain allegations in the Complaint. The court therefore deemed those facts admitted. Specifically, the following facts were deemed admitted:

> a.     "The facts and circumstances surrounding this case involved contracts or agreements which were entered into or to be performed in Utah County, Utah." Complaint, ¶ 5 (Dkt. No. 1, Ex. A); Trial Tr. at 213.
>
> b.     The Mesa Vista Trust Deed was recorded in Utah County on June 15, 2005, and the Green Gables Trust Deed was recorded in Salt Lake County on June 10, 2005. Complaint, ¶¶ 14–15, Trial Tr. at 214.
>
> c.     "Widman commenced making payments to the Defendant Shell, in accordance with the parties agreements." Complaint, ¶ 16, Trial Tr. at 214.

    d.        With respect to Paragraph 18 of the Complaint, the court accepted Shell's

denial that promissory notes were issued. To the extent Shell had any rights

or interest in the alleged Notes, the court deemed admitted that Shell assigned

the rights and interests to Keene on or about October 31, 2006. Complaint,

¶ 18, Trial Tr. at 214.

    e.        Widman has tendered all payments required by the Notes. Complaint, ¶ 20,

Trial Tr. at 214.

**Marital Settlement Documents
and Promissory Notes**

21.      Widman and Shell separated in 2003. Shell thereafter petitioned for divorce from

Widman in California.

22.      On February 16, 2005, Widman and Shell entered into an oral settlement agreement

during a proceeding that was recorded and transcribed. Settlement Transcript (Dfts. Ex. 400)

(hereinafter the "Transcript"). Widman and Shell then executed a Marital Settlement Agreement on

February 25, 2005 that incorporated the transcript of the oral agreement. Marital Settlement Agmt.,

at 1 (Dfts. Ex. 400). On that same date, the divorce was finalized by judgment entered in California.

*Id.*

23.      The divorce judgment included by attachment the Martial Settlement Agreement and

the transcript of the oral settlement agreement. The judgment specifies that "[e]ach attachment to

this judgment is incorporated into this judgment, and the parties are ordered to comply with each

attachment's provisions." Judgment, at 2 (Dkt. No. 400). Accordingly, the court views the oral

settlement agreement and Marital Settlement Agreement (collectively "the marital settlement

documents") together to determine Widman's obligations.

24.     The marital settlement documents require Widman to make equalization payments to Shell in the total amount of $1,215,000.  Part of the equalization payments had to be paid in lump sum amounts as follows: (1) a payment of $15,000, which Widman paid on or about February 18, 2005; (2) a second payment of $150,000, which Widman paid on or about March 20, 2005, and (3) a third payment of $150,000, which Widman paid on or about July 31, 2005.  Widman made each of the lump sum payments in accordance with the marital settlement documents.

25.     To make up the remaining $900,000 owed under the equalization payments, the marital settlement documents required Widman to execute two promissory notes.  The two promissory notes were executed by Widman on the same date (February 25, 2005) as the Marital Settlement Agreement.  With respect to the Notes, the Marital Settlement Agreement provides "Bill Jeffs of the firm of Jeff and Jeff has been retained by wife to prepare the notes and deeds of trusts identified above and to effectuate the transfer of ownership or the companies listed above."  Marital Settlement Agmt., at 14–15 (Dfts. Ex. 400.  It also expressly provides "Husband has waived his right to independent counsel and has chosen to represent himself with regard to the matters undertaken by Bill Jeff.  *Husband has consulted with Bill Jeff and is satisfied that he has carried out the wishes of the parties*."  *Id.* (emphasis added).  Because the Notes are referenced in both of the marital settlement documents and Shell acknowledges Jeffs carried out the parties' wishes, the court also construes the promissory notes together with the oral agreement and Marital Settlement Agreement.[2]

---

[2]  The Marital Settlement Agreement contains an integration clause that specifies it is "the final, complete, and exclusive agreement of the Parties on the matters it covers."  Marital Settlement Agmt., at 19 (Dfts. Ex. 400).  It further states that "[i]t supersedes any previous or contemporaneous

26.     The marital settlement documents required the first promissory note to be in the principal amount of $500,000, payable in installments of $4,166.66 per month beginning July 1, 2005, and secured by a Deed of Trust to real property known as Mesa Vista, which property was awarded to Widman as a part of the divorce judgment. Marital Settlement Agmt., at 5–6 (Dfts. Ex. 400).

27.     The marital settlement documents required the second promissory note to be in the principal amount of $400,000, payable in installments of $3,333.34 per month beginning July 1, 2005, and secured by a Deed of Trust to real property known as Green Gables, which also was awarded to Widman as a part of the divorce judgment. Marital Settlement Agmt., at 6 (Dfts. Ex. 400).

28.     Additionally, the marital settlement documents required Widman to record the Trust Deeds to the Green Gables and the Mesa Vista properties in the county where the properties were located. Marital Settlement Agmt., at 6 (Dfts. Ex. 400). The marital settlement documents did *not* specify that the promissory notes had to be recorded.

29.     For the remaining terms and conditions, the marital settlement documents set forth identical obligations for both of the promissory notes. They are as follows. Widman must make the monthly payments for ten years, with a maturity date of June 30, 2015. "All payments will be due on the 1st of each month . . . and late on the 15th [of the] month if they're not paid by that time."

---

oral or written agreements between the Parties with respect to these matters." *Id.* The clause does not nullify the oral settlement agreement because that was expressly incorporated into the Marital Settlement Agreement. Likewise, it does not nullify the promissory notes because those Notes were executed to fulfill the provisions of the marital settlement documents.

Transcript, at 10 (Dfts. Ex. 400. If a payment is not made by the 15th of the month, an automatic $250 late fee applies. Transcript, at 10; Marital Settlement Agmt., at 5–6. If a payment is not made by the 30th of the month, the entire balance shall become due. Marital Settlement Agmt., at 5–6). Shell may proceed with foreclosure "at any time that the note remains delinquent." *Id.*

30.     With respect to interest, the oral settlement agreement states "[i]nterest on the notes is going to be the minimal - - minimum legal interest required by law, and [Shell agrees] to waive any interest if each payment is made by the 15th." Transcript, at 10 (Dfts. Ex. 400). Additionally, Shell stated "[i]f there is an issue with regard to minimum interest, we will still work it out so that those are the payments over the ten-year period." *Id.* In the Marital Settlement Agreement, it simply states "[i]nterest shall not accrue so long as payments are timely made." Marital Settlement Agmt., at 5–6 (Dfts. Ex. 400). The promissory notes state "[i]nterest shall not be due on the [$400,000 or $500,000] amount." Promissory Notes (Pltf. Exs. 3 and 4). If payments are not received by the 30th of the month, then any interest due would become payable in full. *Id.*

**Preparation and Delivery of Documents**

31.     In accordance with the requirements stated above, William Jeffs was hired to represent Widman and perform the acts described in the Marital Settlement Agreement. Jeffs prepared a Trust Deed Note in the principal amount of $400,000 to be signed by Widman. He also prepared a Trust Deed to the Green Gables property to secure the promissory note. Promissory Note (Pltf. Ex. 3); Trust Deed (Pltf. Ex. 5).

32.     The specific language in the Trust Deed Note for the Green Gables Property provides in relevant part:

FOR VALUE RECEIVED, the undersigned, jointly and severally, promise to pay to the order of David Morton Shell, or his assigns, the sum of Four Hundred Thousand and no/100 Dollars ($400,000.00). Interest shall not be due on the above amount.

The principal shall be payable in monthly installments of Three Thousand Three Hundred Thirty-three 34/100 Dollars ($3,333.34) commencing with a payment on or before the 1st day of July, 2005, and continuing with a like payment on or before the 1st day of each month thereafter until June 30, 2015, at which time the entire accrued unpaid interest and principal shall be paid in full.

In the event that any payment provided to be made hereunder has not been paid in full on or before the 15th day following the day it is due, the holder hereof, in addition to any and all other remedies shall have the right to demand of and receive from the undersigned a late charge equal to Two Hundred and Fifty and no/100 Dollars ($250.00). In the event that any payment provided to be made hereunder has not been paid in full on or before the 30th day following the day it is due, the holder hereof, in addition to any and all other remedies shall have the right to declare the entire principle [sic] and interest due and payable in full.

If default occurs in the payment of said installments of principal and interest or any part thereof or in the performance of any agreement contained in the Trust Deed securing this note, the holder hereof, at its option and without notice or demand, may declare the entire principal and balance and accrued interest due and payable.

Promissory Note (Pltf. Ex. 3).

33.     Jeffs further prepared a second Trust Deed Note in the principal amount of $500,000 to be signed by Widman and a Trust Deed to the Mesa Vista property to secure the second promissory note. Promissory Note (Pltf. Ex. 4); Trust Deed (Pltf. Ex. 6).

34.     The language of the Mesa Vista Trust Deed Note is the same, except that the principal amount to be paid is $500,000 and the monthly installment payment is $4.166.66. Promissory Note (Pltf. Ex. 4).

35.     A screen shot taken from Jeffs' computer reflects versions of the Trust Deed Notes

were prepared in WordPerfect format on February 24, 2005. Screen Shot (Dfts. Ex. 447). It also shows that the Mesa Vista Trust Deed was prepared in WordPerfect format on that same date. *Id.* Jeffs testified at trial that the Green Gables Trust Deed likewise was prepared in WordPerfect format on February 24, 2005, but it had been misnamed as "2002" rather that "2005." Trial Tr. at 205–06. Hence, it did not show on the screen shot for "2005" documents.

36.     Nevertheless, the same screen shot shows that on February 24, 2005, the four documents (i.e. the two Trust Deed Notes and two Trust Deeds for Green Gables and Mesa Vista respectively) were then saved as .pdf files on Jeffs' computer. Screen Shot (Dfts. Ex. 400).

37.     Jeffs testified that he discussed the Notes and the Trust Deeds either by telephone or in a meeting with Widman.

38.     Jeffs testified that he could not remember the exact source of information he collected to prepare the Notes and the Trust Deeds, but that it would have come from Widman and Shell.

39.     Jeffs testified that the reason he  prepared the Trust Deed Notes in Word Perfect and later saved them to .pdf files was so that he could send them by email. He could not remember if, in fact, he had sent the copies of the Trust Deed Notes to Shell.

40.     The evidence shows Jeffs also prepared the Trust Deeds to the Green Gables and Mesa Vista properties to secure the two Trust Deed Notes. Jeffs testified that he discussed them with Shell, but could not remember how he had delivered them to him, whether it was by fax or by email.

41.     Widman testified that she picked up copies of the Trust Deed Notes, the Trust Deeds themselves, and other documents from Jeffs on the evening of February 24, 2005 and took them with her to California for the hearing before the divorce court on February 25, 2005.

42.     Widman testified that at the time of the hearing on February 25, 2005 in California, she executed the two Trust Deed Notes and delivered the originals of those Notes to Shell.

43.     Shell denied that the original executed Trust Deed Notes were delivered to him and testified that he had earlier told Jeffs not to worry about completing preparation of the Trust Deeds and the Trust Deed Notes because payments were not due until July of 2005.  Trial Tr. at 356–57.

44.     Shell further testified that the only documents signed on February 25, 2005 included irrevocable powers of attorney and other documents that were notarized.  Trial Tr. at 356–57

45.     As support for his testimony that the Trust Deed Notes were not executed and delivered to him on February 25, 2005, Shell called Eric Throne, who was the court reporter for the proceedings before the divorce court on that date.  Mr. Throne testified that he notarized several documents at the request of Widman and Shell.  He produced his notary log.  Neither the Trust Deed Notes nor the Trust Deeds were included among the documents that were notarized by Mr. Throne.

46.     Mr. Throne acknowledged on cross-examination, however, that documents could have been executed outside of his presence and he would have had no knowledge about whether those documents included or did not include the Trust Deed Notes.

47.     Widman testified that even though she signed the Trust Deed Notes on February 25, 2005 and delivered them to Shell, the Trust Deeds themselves were not executed on that date.  She stated that Shell wanted to review the Trust Deeds before they were executed.

48.     Copies of the *executed* Trust Deed Notes were not produced at trial.  Widman testified that she did not receive or make copies of the executed Trust Deed Notes.

49.     The Trust Deeds to the Green Gables and Mesa Vista properties were eventually

executed by Widman and notarized on June 6, 2005. Trust Deeds (Pltf. Exs. 5 and 6). The Trust

Deed for the Green Gables property states that it is given to secure "the promissory note of even date

. . . in the principal sum of $400,000, made by Karen Ann Widman." Green Gable Trust Deed, at

1 (Pltf. Ex. 5). The Trust Deed for the Mesa Vista property contains the same provision, except it

refers to a $500,000 promissory note. Mesa Vista Trust Deed, at 1 (Pltf. Ex. 6). At the time the

Trust Deeds were initially drafted, the promissory notes were of even date. It is undisputed that

Widman did not execute any promissory notes in June 2005.

50.     The Green Gables Trust Deed was recorded by the law firm of Jeffs & Jeffs with the

Salt Lake County Recorder on June 10, 2005. Jeffs testified that the original document was returned

to him. Green Gables Trust Deed (Pltf. Ex. 5).

51.     The Mesa Vista Trust Deed was recorded with the Utah County Recorder on June 15,

2005 by Jeffs & Jeffs. Jeffs testified that the original document was delivered by his office to the

County Recorder and returned to him. Mesa Vista Trust Deed (Pltf. Ex. 6).

52.     After the Trust Deeds were returned to Jeffs, he provided the original trust deeds to

Shell. Trial Tr. at 224–25.

**Commencement of Payments and Assignments**

53.     In July 2005, Widman commenced making payments to Shell pursuant to the Trust

Deed Notes in the combined amount of $7,500.

54.     By a document dated October 31, 2006, Shell assigned to Keene "all beneficial

interest under that certain Trust Deed dated and executed on June 6, 2005 by Karen A. Widman,

president of Mesa Vista, Inc." The document referenced the recording information placed on the

Mesa Vista Trust Deed.  The Trust Deed was assigned "together with the Promissory Note of even date in the principal sum of $500,000 made by Karen Ann Widman payable to the order of the beneficiary, the money due and to become due thereon with interest and all rights accrued or to accrue under said Trust Deed."  Assignment of Trust Deed (Pltf. Ex. 10).

55.     On that same date, October 31, 2006, Keene wrote to Widman stating she was the "purchaser of the Trust Deed and underlying Note from David Shell."  She requested that all payments under the Note described in the Trust Deed be made to her, "beginning with the payment due on November 1, 2006."  In that letter, Keene requested that Widman provide her with an endorsed copy of the Note.  Keene Letter (Pltf. Ex. 9).  Because Widman did not have a signed copy of the Note, she did not provide a copy to Keene.

56.     By a document dated November 17, 2006, Shell also assigned to Keene "all beneficial interest under that certain Trust Deed dated and executed on June 6, 2005 by Karen A. Widman, president of Green Gables."  The assignment was made "together with the Promissory Note of even date in the principal sum of $400,000 made by Karen Ann Widman payable to the order of the beneficiary, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Trust Deed."  Assignment of Trust Deed (Pltf. Ex. 11).

57.     The assignment of rights from Shell to Keene did not include any rights to enforce or receive benefits under the Marital Settlement Agreement.

58.     Following the assignment of the Trust Deed Notes and the Trust Deeds, Keene executed a power of attorney authorizing Shell to act on her behalf and Shell directed that the payments be sent to "9080 Bradshaw Road, Elk Grove, CA 95624."  Keene Letter (Dfts. Ex. 427);

Power of Attorney (Dfts. Ex. 428).  Thereafter, Widman made payments to Keene in the care of Shell.  *See* Trial Tr. at 186–87, 194–95, 293–94, 581.

59.     As stated above, approximately three years into this litigation, by a document dated September 11, 2013, Keene assigned back to Shell "all beneficial interest" in the Green Gables and Mesa Vista Trust Deeds, "together with all sums that are due and which were to be due through [the promissory notes which were] to be made by Karen Ann Widman . . . , the money due and to become due thereon with interest, and late fees, and all rights to accrue under said Trust Deed from September 11, 2013."  Keene reserved to herself, however, the right to pursue all previously accrued interest, late charges, and attorney fee that were due and owing.  Assignment of Trust Deeds (Dfts. Exs. 422 and 423).

**Issues and Payments in Dispute**

60.     In May 2007, Shell, apparently acting on behalf of Keene and himself, asserted that payments required under the Trust Deed Notes had not been timely made and that Widman was in default.  Besides contending principal was owed, Shell also asserted he was owed interest from July 2005 until he made the assignments and Keene was owed interest from the date of assignments through May 2007.  Shell E-mail (Dfts. Ex. 414).   From May 2007 forward, Shell acting on behalf of Keene and later himself, contends that Widman has remained in default of her obligations to make the equalization payments required by the Marital Settlement Agreement and owes additional interest.

61.     After Shell and Keene made further claims that other payments were late and Widman was in default, Widman filed this action in Utah Fourth District Court in February 2010, seeking a

declaration from the court that all payments have been timely made, that no interest or late payments are required to be made, and that Widman has not breached any duties or obligations required by the promissory notes. Widman seeks a further declaration of the balance remaining due and owing at the time of trial and that Keene, at that time, was the holder of each of the promissory notes at issue. Complaint (Dkt. No. 1, Ex. A).

62.     With the exception of four discrete months, the evidence supports and the parties do not dispute that two checks, totaling $7,500 were delivered before the 15th of each month. Trial Tr. at 334–35. The months in dispute are May 2007, July 2007, December 2009 and December 2013. The court will address the facts for each of the months that are in dispute and then the legal consequences of its findings.

### A.     The May 2007 Payments

63.     By an email dated May 15, 2007, Shell wrote to Jeffs stating, "Please accept this as a subsequent notice of Default[3] by your client Karen A. Widman, as Trustor and debtor, of those amounts which are due and payable under those certain Trust Deeds and the Marital Settlement Agreement . . . ." Shell E-mail (Dfts. Ex. 414). In the email, Shell stated that the payments for May 2007 of principal and interest on the Trust Deed Notes had not been made. Shell further stated that interest was due at the legal rate of 10% per annum on $900,000 principal amount, which had accrued since July 1, 2005 in the amount of $130,000 in unpaid interest to Shell. Shell further

---

[3]     As background, in November 2006, Widman's counsel took over sending the monthly payments. Rather than sending the payments so they arrived by the 1st, counsel sends them so they arrive after the 1st but before the 15th of the month. When this practice started to occur, Keene informed Widman that she believed this constituted a default and that Widman therefore owed interest on the entire balance of the Notes. *See* Walker Letter, at 4 (Dfts. Ex. 417).

claimed an additional $30,000 in unpaid interest and principal was due to Keene "since January 1, 2007," plus amounts for late charges. Shell E-mail (Dfts. Ex. 414).

64. In response to Shell's May 15, 2007 email, Jeffs verified that a cover letter dated May 2, 2007 addressed to Marilee E. Keene, c/o David Shell at 9080 Bradshaw Road in Elk Grove, California, together with two checks totaling $7,500 had been placed with Federal Express. Jeffs or others in his office contacted Federal Express to track the payment. The printout of the Fed-Ex tracking sheet showed that the Fed-Ex package had been delivered on May 4, 2007. The tracking number matched with the Airbill showing delivery to Marilee E. Keene c/o David Shell at 9080 Bradshaw Road, Elk Grove, California 95624. Trial Tr. at 137–38; Fed-Ex Proof of Delivery (Pltf. Ex.17); Fed-Ex Airbill (Pltf. Ex. 18); *see also* Cover Letter (Dfts. Ex. 411).

65. By an email dated May 31, 2007, Shell gave further notice to Jeffs that Widman was in default of her obligations and that Keene was taking the position that the Notes had been accelerated and were due with all accrued interest. Shell E-mail (Pltf. Ex. 19).

66. By a letter dated the same day, May 31, 2007, Jeffs responded to Shell's email. In the letter Jeffs stated that Federal Express had delivered the checks to Shell's address on May 4, 2007. Jeffs provided a copy of the Federal Express tracking invoices to show that the checks had been delivered. Jeffs further stated "if you would like me to reissue the checks and Federal Express them to Ms. Keene, please have her sign a notification that she is claiming that they did not receive them, I can stop payment of the checks and deduct the amount of the stop payment from her check and pay the balance of it to her." Trial Tr. at 139–40; Jeffs Letter (Pltf. Ex. 20).

67. Keene testified that she found the request in the letter from Jeffs "very unreasonable."

She therefore ignored the request and did not provide confirmation that she had not received the checks. Trial Tr. at 333–34.

68.     Jeffs did not at that time reissue the checks. Jeffs testified that he had required verification from Keene that she had not received the checks because he did not want the checks, which Federal Express confirmed had been delivered to the address where Keene requested they be sent, to clear the bank twice. Trial Tr. at 140–41.

69.     On October 31, 2007, Jeff Walker, an attorney who had been hired to represent Keene, wrote to Jeffs. He acknowledged that the parties had been working to resolve the dispute between them and he was providing a summary of the issues "[s]o that there is not any confusion as [to] our client's position." Walker Letter, at 1 (Dfts. Ex. 417). Besides walking through Widman's alleged failure to execute promissory notes, Walker detailed how Widman was in violation of the divorce judgment. In particular, he stated the first time a payment by Widman had not arrived on the 1st of the month, the payment was untimely, Widman was in default, and interest started accruing on the 2nd for the entire principal amount of the Notes. Accordingly, he claimed $215,259.91 was due in interest. He further claimed that $3,000 in late fees were due and owing for each month since May 2007 since Keene had not received the two checks for that month. Finally, Walker asserted the remaining principal balance had been accelerated and was due because the May 2007 payments had not been received by the 30th of the month. Walker therefore demanded that Widman remit $923,259.91 or his client would commence legal action. *Id.* at 5.

70.     Jeffs replied to the letter on November 2, 2007. Jeffs Letter (Pltf. Ex. 21). Rather than remitting the amount demanded, Jeffs enclosed two re-issued checks for the May 2007 payment

and paid an additional $500 ($250 for each of the checks) as late fees for the May 2007 payments. The May 2007 payments and the late fee payments were sent to Walker because he is the person who had issued the instructions in the October 2007 letter. Jeffs stated that his sending of the payments should not be construed as an admission of liability. Rather, "[i]t is simply an effort by my client to resolve a dispute in good faith. In the event that your client is not willing to accept the monies under the afore mentioned terms, those funds should be returned to this office." *Id.*; Trial Tr. at 140, 148–49.

71.    Jeffs included the language in the letter to resolve the dispute and indicated that "if they accept our money this matter is resolved and tell them if they don't agree with it they need to send the money back" Trial Tr. at 151.

72.    The checks were accepted by Keene as is evident from the fact that they were cashed and cleared the bank. Trial Tr. at 153–54. Moreover, Keene did not commence any legal action against Widman.

**B.    The July 2007 Payment**

73.    While the May 2007 payment issue was still being resolved, a second issue arose in July 2007. The Fed-Ex package containing the July 2007 payment was sent before the 15th of the month, but it was misaddressed and returned to Jeffs. The evidence is unclear about how the error occurred, but it is undisputed that the error was made by someone in Jeffs' office. Jeffs immediately re-sent the checks by Federal Express to Keene. Trial Tr. at 142.

74.    Both checks were delivered by Federal Express to Keene on July 19, 2007. Jeffs testified that it was his impression that the July 2007 checks were returned to him because the

required signature acknowledging delivery had not been received. Trial Tr. at 146; Fed-Ex Tracking Info. (Pltf. Ex. 30). Thus, he did not enclose the late fees for those checks. Nevertheless, it is undisputed that the Fed-Ex package was addressed to the wrong address.

75.     Later, when Jeffs sent the re-issued checks to Walker for the May 2007, he also enclosed a payment of $500 ($250 for each of the checks) as late fees for the July 2007 payment. Trial Tr. at 105–06, 1051–52; Check Copy (Pltf. Ex. 25). In the November 2, 2007 letter, Jeffs stated those late fees payments were to resolve the dispute in good faith and they should be returned if Keene was unwilling to resolve the dispute on those terms.

76.     The July 2007 payments were accepted by Keene as is evident by the fact that the checks were also deposited and cleared the bank. Trial Tr. at 153–54.

### C.     The December 2009 Payment

77.     In a Federal Express package dated December 8, 2009, Jeffs sent the payments for December 2009 to Keene in care of Shell. Trial Tr. at 162; Check Copies (Pltf. Exs. 178 and 179); Fed-Ex Airbill (Pltf. Ex. 180).

78.     On December 31, 2009, Walker, acting as counsel for Keene, notified Jeffs that Keene had not received the payments for December 2009. Trial Tr. at 161. Walker acknowledged in his letter that the Fed-Ex tracking showed that the Fed-Ex package had been "left at the front door of the 'recipient' on December 10, 2009." Nevertheless, he asserted the package had never been received. He suggested that the checks be canceled and new checks issued. Walker did not attempt to accelerate the Notes nor demand a late payment. Walker Letter (Dfts Ex 418).

79.     Jeffs testified he did not know why the December checks were not received by Keene,

but that he delivered the checks by Federal Express on December 8, 2009.  Trial Tr. at 165.

80.     On January 6, 2010, Jeffs responded by letter to Walker and sent replacement checks for the December 2009 payments.  Trial Tr. at 163–64; Jeffs Letter (Pltf. Ex. 181); Check Copies (Pltf. Exs. 182 and 183).  Jeffs did not enclose any late fees for the December 2009 payments.

81.     The December 2009 payments were accepted by Keene as is evident from the fact that the checks were deposited and cleared the bank.  Trial Tr. at 153–54.

**D.     The December 2013 Payment**

82.     By December 2013, Keene has reassigned the Notes and Trust Deeds to Shell. Consequently, in that month, Jeffs sent two checks to Shell and the checks were received before December 15, 2013.  Trial Tr. at 168–69.

83.     Shell nevertheless objected that the December payment for Mesa Vista had not been made because it was two cents short.  Jeffs responded by sending a check for two cents and a late fee of $250.   Trial Tr. at 169–70, 174; Cover Letter (Pltf. Ex. 376); Initial Check Copies (Pltf. Ex. 377); Jeffs Letter (Pltf. Ex. 378); Check Copies (Pltf. Ex. 379).


## CONCLUSIONS OF LAW

**I.     CHOICE OF LAW**

This court is sitting in diversity and must make a choice of law determination.   The promissory notes at issue do not contain a choice of law provision, but the Notes were executed and delivered in California to resolve a marital dispute in a California divorce proceeding.  Moreover, the Marital Settlement Agreement states that document shall be governed and construed in

accordance with California law.  Finally, the parties have not disputed that California law applies.

The court therefore concludes that California law applies to the substantive issues in this case.[4]

## II.     DELIVERY OF THE NOTES

Shell contends in his Answer that Widman never executed or delivered the required promissory notes to Shell.  The court concludes the evidence presented in this case more than adequately establishes that the Trust Deed Notes were executed and delivered by Widman to Shell on or about February 25, 2005.

The evidence presented includes (a) Shell's acknowledgment in the Marital Settlement Agreement that Jeffs had carried out the parties' wishes, (b) Jeffs' computer screens showing when the Notes were drafted and Jeffs' testimony about the events, (c) Widman's testimony that she delivered the Notes to Shell on February 25, 2005, (d) Widman's commencement of monthly payments in accordance with the Notes' terms in July 2005, (e) Widman's tendering of all payments required by the Notes for each month thereafter, (f) Shell's acceptance of the Deeds of Trust, where the sole purpose of the Trust Deeds is to secure the Notes,[5] and (g) Shell's acceptance of the payments from July 2005 until the assignments to Keene in late 2006.

---

[4]  For the Trust Deeds, the parties elected to have Utah law govern them.  Because the substantive issues in this matter largely focus on the promissory notes and marital settlement documents, the election under the Trust Deeds does not alter the court's analysis.

[5]  A well-known principal is that "[a] security interest cannot exist without an underlying obligation."  *Nguyen v. Calhoun* (2003) 105 Cal. App. 4th 428, 439 (quotations and citation omitted).  The testimony shows that Shell reviewed the Trust Deeds and accepted the original, executed Trust Deeds after they were recorded.  This provides strong, contemporaneous evidence that Widman had, in fact, executed and delivered the Notes that were the underlying obligation for the Trust Deeds.

In addition, the court concludes that Shell's assignment of the Notes and Trust Deeds[6] to Keene in late 2006 constituted an acknowledgment by Shell and by Keene that the Notes existed and that the Notes were valid and enforceable. The validity and enforceability of the Notes is further confirmed by the fact that Keene (and now Shell again) have continued to accept payments pursuant to those Notes after the assignment to Keene and later reassignment back to Shell.

Finally, because Widman's testimony was more credible than Shell's, the court accepts Widman's testimony that she executed and delivered the promissory notes to Shell and that he retained the originals. Viewing these facts in totality, the court concludes that Widman complied with terms of the marital settlement documents by executing and delivering the promissory notes to Shell that are consistent with the terms of the parties' agreement. Declaratory judgment is awarded to Widman on this issue.

## III.  CONTRACT INTERPRETATION

Widman seeks, in part, declaratory judgment that she has complied with the terms of the promissory notes, that no interest is required to be paid on the notes, and that no late fees are owing. As discussed above, the court has concluded that the promissory notes were executed and comply with the terms of the marital settlement documents. Accordingly, the promissory notes must be interpreted together with those documents.[7] Under California law,

---

[6]  The Trust Deeds refer to promissory notes "of even date." Trust Deeds, at 1 (Pltf. Exs. 5 and 6). That phrase was true at the time the promissory notes and Trust Deeds were drafted. It appears the phrase was not altered when the Trust Deeds were executed at a later date than the promissory notes.

[7]  During the trial the court received the marital settlement documents into evidence "for purposes of understanding and construing what the intent of the parties was as reflected in the Promissory Note." Trial Tr. at 353.

> the interpretation of a written instrument, even though it involves what might properly be called questions of fact, is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purpose of the instrument may be given effect. Extrinsic evidence is admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible, and it is the instrument itself that must be given effect. It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. . . . [W]here the evidence is conflicting, the trial court's resolution is binding.

*Aviointeriors Spa v. World Airways* (1986) 181 Cal. App. 3d 908, 915 (quotations, citations, and alterations omitted).

Here, Shell stated that the parties' intent is reflected in the transcript of their oral agreement. *See* Trial Tr. at 352–53. Widman does not contest that the transcript accurately reflects the terms agreed to by her and Shell. The parties do disagree, however, about what some of the terms mean in the marital settlement documents. They provided additional testimony about the circumstances surrounding their settlement and what some of their concerns were at that time. Because some of the terms are ambiguous, in that they are susceptible to more than one meaning, the court interprets the marital settlement documents and promissory notes based on the documents themselves and the evidence presented at trial.

### A.    Accrual of Interest

Having concluded that the promissory notes were executed and delivered, the next key issue is whether interest accrues on the Notes. The Transcript states Shell agrees "to waive any interest if each payment is made by the 15th." Transcript, at 10 (Dfts. Ex. 400). The Marital Settlement Agreement states "[i]nterest shall not accrue so long as payments are timely made." Martial

Settlement Agmt., at 5–6 (Dfts. Ex. 400). The promissory notes state "[i]nterest shall not be due on the [$400,000 or $500,000] amount," and if payments are not received by the 30th of the month, then any interest due would become payable in full. Promissory Notes (Pltf. Exs. 3 and 4).

Because the "interest" requirements ambiguous in the marital settlement documents and promissory notes, Shell and Keene offer several options about how interest accrues. Significantly, Shell testified that he told Jeffs, when he was drafting the Notes and trust deeds, that interest would not accrue if payments were received by the 15th of the month. Trial Tr. at 358. Applying this fact, Shell asserts one option for how interest accrues is that if even one payment is not received by the 15th of the month, then interest will date back to the Note's origination and accrue from July 1, 2005 through the end of the Note. Trial Tr. at 370. Because the original Notes were for $900,000, interest at 10% per annum would be $90,000 per year, for ten years, resulting in Widman owing an additional $900,000 to Shell.

Under the second option, interest would begin accruing on the 1st day of the month in which a payment was received after the 15th of the month, and that interest would accrue for every month thereafter until the end of the ten-year-note period. Trial Tr. at 371. Shell contends that interest would have commenced on May 1, 2007 if this option is followed. Shell further broke out options to apply payments to interest first or to principal first. *Id.*

In contrast, Widman contends no interest accrues under the Notes—they were interest free Notes, and that any reference to interest is that which may occur when proceeding on collections under the Trust Deeds. Widman testified that she was very concerned about interest on the Notes, which is why she only agreed to late fees and acceleration, rather than interest, if payment was not

made timely.

Shell and Keene's interpretation is unique, not credible, and not supported by the documents. Widman's testimony was credible regarding her concern about paying interest, largely because it was apparent there was significant acrimony between the parties and that Shell would exact every measure he could from Widman. For example, although Shell admits he told Jeffs that interest would not accrue unless payments were received after the 15th of the month, Keene (with Shell's involvement) informed Widman interest accrued and was owing when she made payments after the 1st but before the 15th. *See* Walker Letter, at 4 (Dfts. Ex. 417) (stating Keene, acting through her agent, made the stated demands on Widman). Making such demands on Widman were improper and contrary to the parties' agreement. Those actions support that Widman's concerns were well-founded and that she would seek to protect herself from draconian interest demands.

Moreover, the Transcript reflects that Widman only agreed to such interest as would allow her to hold to the specified monthly payment amount. Specifically, after the monthly payment amount was stated, Shell then said "[i]f there is an issue with regard to minimum interest, we will still work it out so that those are the payments over the ten-year period." Transcript, at 10 (Dfts. Ex. 400). Certainly, if $900,000 in interest accrued over one late payment, Widman would not have been able to hold to the agreed upon monthly payment. It would have been $15,000 a month rather than $7,500. The court therefore rejects Shell and Keene's contention that if one payment was late, interest would accrue from the advent of the Notes, or from the month of the late payment through the end of the ten-year-note period. It is simply not credible that Widman would have agreed to such a term.

That said, the marital settlement documents, Notes, and other evidence do contemplate that interest will accrue under limited circumstances. Viewing the evidence in totality, the court concludes that when a payment has not been received by the 15th of the month, interest accrues from the 1st of that month in which payment is late through the date that payment is made. Once the late monthly payment is made, then interest ceases to accrue. Besides being in harmony with the evidence, this interpretation protects Shell's rights in receiving timely payments and it protects Widman from overreaching by Shell.

The court further concludes that interest accrues on the unpaid balance of the Notes at the rate of 10% per annum rather than on the original Note amounts. This conclusion is supported by the Notes themselves, which state "[i]nterest shall not be due on the above amount." Promissory Notes (Pltf. Ex. 3 and 4). The "above amount" is the original Note amount. Thus, interest shall not accrue on the original Note amount but merely on the unpaid balance of the Notes. Moreover, since none of the documents contemplate interest accruing on the late fees, the court concludes those fee amounts shall not be added to the principal when calculating interest accrual.

Finally, the promissory notes also state that if the Notes are accelerated, then any interest due will become payable in full. While that provision is not contrary to the terms of the marital settlement documents, the court concludes it is redundant because it adds no more to Widman's obligations. This is so because the amount accelerated would be the unpaid balance of the Notes, which is the same amount on which interest accrues if payment is not made by the 15th of the month.

**B.** **Default and Foreclosure**

      1.    <u>Penalties for a Late Payment</u>

To resolve the remaining issues in this case, the court must also determine when default occurs under the Notes and when foreclosure may be pursued. Foreclosure is a drastic remedy with significant consequences. *See Multani v. Witkin & Neal* (2013) 215 Cal. App. 4th 1428, 1448 (stating "nonjudicial foreclosure is a drastic sanction and a draconian remedy") (quotations and citation omitted)). The court therefore construes any such provision narrowly.

The transcript states that "[a]ll payments will be due on the 1st of each month . . . and late on the 15th [of the] month if they're not paid by that time." Transcript, at 10 (Dfts. Ex. 400). The transcript, Marital Settlement Agreement, and Notes specify that if a payment is not made by the 15th of the month, an automatic $250 late fee applies. *Id.*; Marital Settlement Agmt., at 5–6 (Dfts. Ex. 400). These provisions constitute a clear grace period. While payment is due on the 1st of the month, it is not deemed late unless payment is made after the 15th of the month. If payment is made after the 15th but by the 30th of the month, the court concludes the remedy is a $250 late fee and accrual of interest, but not default. *See* Trial Tr. at 358–59. Rather, as discussed next, default occurs after payment is more than 30 days late.

      2.    <u>Foreclosure</u>

The Marital Settlement Agreement states that if payment is not made by the 30th of the month,

> [t]he *entire balance shall become due immediately*. . . . Failure to begin foreclosure procedures shall not be deemed a waiver that would prevent [Shell] from doing so in the future *at any time that the note remains delinquent*.

Marital Settlement Agmt., at 5–6 (Dkt. No. 400) (emphasis added). The Agreement does not expressly state when the Notes become "delinquent." The Trust Deeds securing the Notes, however, provide additional insight. Notably, the Trust Deeds were executed approximately three-and-a-half months after the Marital Settlement Agreement and none of the parties dispute the terms stated therein. Moreover, Shell acknowledges that he received the original Trust Deeds shortly after they were recorded. *See* Trial Tr. at 387–88. Hence, the Trust Deeds provide strong evidence about when default occurs for purposes of foreclosure.

According to the Trust Deeds, upon default, all sums under the Notes are immediately due and payable and foreclosure may then occur. Trust Deeds, at 2–4 (Pltf. Ex. 5 and 6). Under the Marital Settlement Agreement, the only time the Notes may be accelerated is if payments are more than 30 days late. Thus, "default" is tied to that period of time after payments are more than 30 days late and foreclosure may not occur until after default. Shell's testimony at trial supports this interpretation. *See* Trial Tr. at 362 (testifying he wrote to Jeffs "when the 30 days had run for foreclosure").

The Agreement also provides that foreclosure may occur only if "the note *remains* delinquent." The court concludes this is a further limitation on the right of foreclosure. Hence, if payment has not been received for more than 30 days, Shell may proceed with foreclosure as long as the Note *remains* delinquent when he initiates foreclosure proceedings.

Applying these provisions, the court now addresses the remaining issues in dispute between the parties.

**IV.    WIDMAN'S CLAIM FOR DECLARATORY RELIEF**

Widman seeks declaratory judgment that she has timely paid all payments required by the promissory notes. The only months in dispute are May 2007, July 2007, December 2009 and December 2013. Based on the court's ruling that interest does not date back to the Notes' origination dates, any claim that Shell had a right to interest from the date of origination until he assigned the Notes to Keene are invalid as a matter of law. Because Keene was the sole holder of the Notes in May 2007, July 2007, and December 2009, only she may assert a claim that the payments were untimely. Because Shell retains rights and duties under the marital settlement documents, however, the court addresses his conduct when addressing the disputed payments.

**A.    The May 2007 Payment**

1.    <u>Timely Remittance of Payments</u>

Federal Express is a well known commercial courier that employs a "means to track and record delivery." *See Sun Prot. Factory, Inc. v. Tender Corp.*, No. 6:04-cv-732, 2005 U.S. Dist. LEXIS 35623, at *5 n. 2 (M.D. Fla. Oct. 7, 2005). The evidence shows Widman sent the May 2007 payment via Federal Express on May 2, 2007.[8] Federal Express tracked the package as part of its normal course of business and showed that the payment package was delivered at the proper address on May 4, 2007. The court therefore concludes that Widman's payment was delivered to Keene on May 4, 2007.

Keene contends, however, that she never received the payment and the evidence shows the

---

[8] Shell and Keene have argued that Widman should wire the monthly payments. Neither the marital settlement documents nor the Notes require a specific method for delivery. Widman is therefore within her rights to tender payments via a commercially recognized courier.

initial two checks for the May 2007 payment were never negotiated. Shell and Keene contend Widman is liable for the failed delivery and owes late fees and interest, as well as the accelerated loan balance.

Under California law, "payment sent by mail or through a public carrier does not become operative until it gets into the hands of the creditor." *Cornwell v. Bank of Am*. (1990) 224 Cal. App. 3d 995, 999 (quotations and citation omitted). Shell and Keene contend the payment must be physically placed in their hands. It is insufficient that payment was delivered to the specified address.

In *Cornwell*, the plaintiff made all but one mortgage payment timely. *Id.* at 997. As to that one payment, the plaintiff asserted he had mailed the mortgage payment, but there was no evidence the payment had been delivered. *Id.* Somehow, the payment had been lost in the mail. When the plaintiff was informed about the non-delivery, he never offered to re-issue the check. Instead, he contended he had satisfied his payment obligation and the payment should be credited simply because he mailed the payment. *Id.* The court disagreed. *Id.* at 999. In so doing, it noted that a check is merely a "conditional payment" and that even if the bank had received the check and then lost it, "payment would still not have been made." *Id.* at 1000–01. The context, therefore, of the Court's statement was whether a payment had been discharged, not whether payment had been timely tendered.

For a tender to be recognized,

> The tenderer must do and offer everything that is necessary on his part to complete the transaction, and must fairly make known his purpose without ambiguity, and the act of tender must be such that it needs only acceptance by the one to whom it is made to complete the

transaction.

*Nguyen*, 105 Cal. App. 4th at 439 (quotations and citation omitted).  When "tender of payment of an amount due on an instrument is made to a person entitled to enforce the instrument, the obligation of the obligor to pay interest after the due date on the amount tendered is discharged."  Cal. U. Com. Code § 3603 (2014).

In this case, Widman has never contended that her *payment* obligation was satisfied when she timely mailed and delivered the May 2007 payment.  This case is therefore distinguishable from *Cornwall*.  Rather, Widman has asserted that by sending the payment via Federal Express and tracking its delivery to the proper address she satisfied her *tender* obligation.  Indeed, after tendering the payment to Keene at the proper address, the only thing remaining was Keene's acceptance of the tender to complete the transaction.  The court therefore concludes that Widman timely tendered her payment to Keene and that by making the tender timely, no interest or late fees accrued for the May 2007 payment.  Thus, while Keene retained the right to demand payment, she lacked the power to impose penalties upon Widman.

In contravention of these principles, however, Shell and Keene not only sought to impose late fees and interest, they sought to place Widman in default.  A party to a contract has both a duty to act in good faith and to act reasonably to mitigate any injury that may follow from an alleged default. The duty to act in good faith is well established under California law.

> It has long been recognized in California that "[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement."

*Kransco v. Am. Empire Surplus Lines Ins. Co.* (2000) 23 Cal. 4th 390, 400 (quoting *Comunale v.*

*Traders & Gen. Ins. Co.* (1958) 50 Cal. 2d 654, 658, 328 P.2d 198). "The scope of the duty of good

faith and fair dealing depends upon the purposes of the particular contract because the covenant is

aimed at making effective the agreement's promises." *Id.* (quotations and citations omitted). The

duty to act in good faith must arise from an obligation in the contract.

Here, the Trust Deed Notes were contracts imposing on Widman the obligation to make the

required installment payments. The Notes satisfied her obligation under the marital settlement

documents to make equalization payments to Shell. The Notes imposed on Widman the duty to

make the payments timely and imposed on Shell the duty to accept those payments. The Notes

allowed Widman to make payment on or before the 15th of the month without any penalty. Shell

had a duty to accept timely payments without asserting or claiming additional penalties, interest or

remedies. By accepting assignment of the Trust Deed Notes, Keene also became bound by the

covenant of good faith not to act in any way to prevent Widman from enjoying the benefits of the

bargain she had made with Shell. In other words, the implied covenant of good faith imposed on

Keene a duty to accept the timely-made May payment, and to do nothing to prevent Widman from

realizing the bargain she had made.

Once Shell and Keene received confirmation that Widman had timely mailed and delivered

the May 2007 payment to the proper address, the burden shifted to them to mitigate the failed

acceptance of that delivery. Widman offered to reissue the checks. Because she had confirmation

that the original checks had been delivered, it was reasonable for her to request that Keene confirm

in writing that she had not received the originals to avoid complications from multiple payments

clearing the bank.[9]  Rather than confirming that the checks would not be negotiated by her and

cooperating for the delivery of replacement checks, Keene deliberately ignored the request because

she deemed it unreasonable.  Keene and Shell then pressed for late fees, $160,000 in interest, and

later acceleration of the Notes.  Thus, while the matter could have been resolved quickly, and good

faith was shown by Widman's initial delivery of the payments and willingness to re-issue the checks,

the situation escalated due to Keene and Shell's efforts to gain an advantage and assert rights to

payments and acceleration of the Notes beyond the agreement reached between Shell and Widman.

This constituted a breach of Keene and Shell's duty to act with good faith and fair dealing.

    The fact that it took until November 2007 to resolve this issue reflects on Keene and Shell

rather than Widman.  Moreover, the $500 in late fees they exacted to resolve the issue is further

evidence of their bad faith.  Based on this evidence, the court concludes the May 2007 was timely

and that no late fees, interest, or note acceleration were triggered.

      2.    <u>Accord and Satisfaction</u>

    Even if Widman did not timely remit the payments, however, the evidence also shows

Widman's obligations were satisfied based on accord and satisfaction.  Under the terms of the Trust

Deed Notes, the holder of the Notes had the right to "demand" and "receive" a late payment of $250

for any payment that is not "paid in full" on or before the 15th of the month.  The Notes further

provide that if a payment is not "paid in full" by the 30th day after it is due, the holder may declare

---

[9] Widman also requested that Keene bear the cost of stop-payment fees because Widman had tendered the checks to the proper address and it was Keene who failed to accept the checks properly. Ultimately, Widman reissued the checks without Keene ever bearing the cost.  Having not met this demand to mitigate damages, Keene cannot now assert she was injured by it.

the entire "principal and interest due and payable in full." The Notes do not specify a separate default interest rate.

The evidence supports and the court finds that the May 2007 payment were delivered by Federal Express to Keene to the address which she had specified. Nevertheless, Keene denies receiving the payment in May 2007. If this statement were accepted as true, Shell's "Notice of Default" on May 15, 2007 would still be inappropriate as default is not triggered until payment is more than 30 days late. Moreover, the grace period had not even expired because the notice was sent on the 15th of the month.

Nevertheless, in an effort to resolve the dispute, Jeffs entered into negotiations with Shell and later with Keene's counsel. Five months into the dispute, on October 31, 2007, Walker sent a letter to Jeffs detailing his client's position about Widman's alleged default obligations. At that time, a dispute existed as to whether Widman had made timely payment and whether Keene have effectively made a demand for a late payment, interest, and to accelerate the Notes. The rights Keene attempted to assert were disputed and not clearly allowed under the Trust Deed Notes.[10]

Rather than meeting the demands stated in Walker's letter, Jeffs responded by sending replacement checks as well as $500 to cover the late fees for the two check payments. In the letter, Jeffs made it clear that he was offering the replacement checks and $500 late fee payment to resolve the dispute. Specifically, he stated, "It is simply and effort by my client to resolve a dispute in good

---

[10] It also remained in dispute as to whether Widman owed Shell any interest before he assigned the Notes and Trust Deeds to Keene. As stated above, however, Shell had no right to such interest as a matter of law; and therefore, he cannot proceed against Widman based on a right he did not have.

faith." Jeffs Letter (Pltf. Ex. 21); Trial Tr. at 140, 148–49. Jeffs further made it clear that "[i]n the event that your client is not willing to accept the monies under the afore mentioned terms, those funds should be returned to this office." Jeffs Letter (Pltf. Ex. 21). In other words, Jeffs stated "if they accept our money this matter is resolved and tell them if they don't agree with it they need to send the money back." Trial Tr. at 151. Keene accepted both the May 2007 principal payment for both Green Gables and Mesa Vista and the late payments. Further demands by Shell and Keene then ceased at that time.

Under California law, an accord and satisfaction is a defense "applicable to the disposition of a dispute over an unliquidated claim." *FEI Enterprises, Inc. v. Yoon* (2011) 194 Cal. App. 4th 790, 803. The California Court states the requirements follows:

> To succeed on such a defense, it must be established (1) that there was a "bona fide dispute" between the parties, (2) that the debtor made it clear that acceptance of what he tendered was subject to the condition that it was to be in full satisfaction of the creditor's unliquidated claim, and (3) that the creditor clearly understood when accepting what was tendered that the debtor intended such remittance to constitute payment in full of the particular claim in issue.

*Id.* (citation omitted). "Any obligation may be the subject of an accord and satisfaction, provided the applicable requirements are satisfied. This obviously includes disputed obligations . . . ." 27-77 Calif. Legal Forms: Transaction Guide § 77.16 [6][b] (Matthew Bender). In this case, Widman satisfies each of the requirements.

### (a)  *Bona Fide Dispute*

A dispute is bona fide if the disagreement arises from a "state of mind denoting honesty of purpose, freedom from intention to defraud, and generally speaking, means being faithful to one's

duty or obligation." *FEI Enterprises, Inc.*, 194 Cal. App. 4th at 797 (quotations and citation omitted). With limited exceptions the test is an objective test. "A legal dispute between two parties exists, is 'legitimate', 'genuine,' 'bona fide,' or in 'good faith' where the arguments asserted or positions taken have objective legal tenability. Nothing more should be required." *Id.* at 805–06 (emphasis omitted).

In this case, the dispute initially arose over whether Jeffs, on behalf of Widman, had delivered the May 2007 payment. Jeffs contended he had delivered the payment and confirmed the delivery with Federal Express. Keene denied receiving the payment, but refused to provide confirmation of that fact when requested. She objected that the request was unreasonable and to being charged a fee to stop payment. The dispute escalated when Shell, purporting to act on Keene's behalf, demanded interest payments that were not clearly provided for in the Trust Deed Notes and attempted to accelerate payment of the principal. The dispute continued until October and November when Walker became involved.

The court concludes that both Jeffs and Widman proceeded with honesty of purpose to dispute Keene's claim that the payment had not been delivered and that interest was due in the amounts Keene and Shell claimed. Given that Jeffs had confirmed delivery of the Fed-Ex package, the court concludes that Widman and Jeffs also proceeded to dispute in good faith that Keene had the right to accelerate the Notes. The court therefore finds that Widman has satisfied the first element.

> (b)     *It Was Clear that Acceptance Would be a Satisfaction*

When Jeffs tendered the re-issued checks for the May 2007 payment, he expressly

conditioned acceptance of the checks as a complete resolution of the dispute. When he stated, "[i]n the event that your client is not willing to accept the monies under the afore mentioned terms, those funds should be returned to this office," the "afore mentioned" terms were the May 2007 installment payments for each Note, along with a late payment of $250 for each Note. Jeffs Letter (Pltf. Ex. 21); Trial Tr. at 140, 148–49. Moreover, Jeffs made it clear that if a complete resolution of all disputes arising from the May 2007 payment was not accepted, Keene was required to return the tendered checks. The court concludes that by tendering re-issued checks and late fees, Jeffs acting for Widman made it clear that acceptance would resolve all issues arising from the dispute. The court therefore finds that Widman has satisfied the second element.

### (c)    Keen Accepted the Payment as Resolution of Dispute

It is well accepted under California law that negotiation of a tendered payment, the acceptance of which is clearly to be for resolution of the dispute, is a full satisfaction.

> The great weight of authority in American courts undoubtedly supports the rule that where the amount due is in dispute and a check for an amount less than that claimed is sent to the creditor with a statement that it is sent in full satisfaction of the claim, and the tender is accomplished by such acts or declarations as amount to a condition that if the check is accepted at all it is accepted in full satisfaction of the disputed claim, and the creditor so understands, its acceptance by the creditor constitutes an accord and satisfaction, even though the creditor states at the time that the amount tendered is not accepted in full satisfaction.

*Wallace v. Crawford* (1937) 21 Cal. App. 2d 394, 405 (quoting 1 California Jurisprudence, § 10, at 134); *see also In re Marriage of Montgomery & Harwood* (2008) 161 Cal. App. 4th 745, 750 (citing with approval *Wallace*). In deciding whether the tendered payment was accepted as a satisfaction, the court is to consider the conduct and statements of the parties. *Wallace*, 21 Cal. App. at 405. A

party's later denials and self-serving testimony does not dictate a contrary finding where the statements and conduct of the parties indicate otherwise. *See, e.g.*, *Thompson v. Williams* (1989) 211 Cal. App. 3d 566, 573 (citations omitted).

In this case, the statement was clear that Keene was required to return the May payments and late fee checks if they were not accepted as a full resolution. Keene did not return the payments, but rather accepted them. The checks were cashed and cleared the bank. Trial Tr. 153–54. Moreover, Keene continued to accept the monthly installments and took no actions to exercise her remedies to foreclose on the Green Gables and Mesa Vista properties. Keene's failure to act was not consistent with her later claim that interest remained due and owing, that the Notes had been accelerated and Widman was in continuing default. Notwithstanding her later denials and statements, the court concludes that Keene accepted the payments tendered for the disputed May 2007 payment as a satisfaction and resolution of the dispute. The court finds that Widman has satisfied the third element.

The court finds that Keene accepted the proposed accord and satisfaction. Her acceptance resolved all issues related to the May 2007 payment and any demand for interest or an attempt to accelerate the principal on the Notes.

### B.     The July 2007 Payment

The July 2007 payment was mailed timely, but it had the wrong delivery address on the package. As a result, the July 2007 payment was delivered to Keene on July 19, 2007, four days after the 15th of the month, but before the 30th of the month. Under the terms of the Notes, the remedy for a late payment received after the 15th but before the 30th is a late payment of $250 for

each Note, along with interest at a rate of 10% per annum from July 1st through July 19th. Widman has already paid the late fees. Thus, the only amount that remains due is interest.

From July 2005 to July 2007, Widman had completed 23 payments[11] of $7,500 for a total of $172,500. Subtracting that figure from $900,000 (original balance) leaves an unpaid balance of $727,500 as of July 2007. Applying interest to that unpaid balance at a rate of 10% per annum equals $72,750, which is then divided by 365 days for a daily interest accrual of $199.32. The daily interest rate then accrued for 19 days for a total of $3,786.99. The court concludes this was the total interest that accrued for the July 2007 late payment.

This figure must be offset, however, by the $500 in late fees that Widman unnecessarily paid for the May 2007 payment. Additionally, Widman erroneously paid another $500 in late fees in August 2008. In that month, payment was sent on the 11th. Trial Tr. at 155; Check Copy (Pltf. Ex. 114). Her counsel mistakenly believed that payment was late on the 10th rather than the 15th. Trial Tr. at 155. Hence, $500 in late fees were sent to Keene that month and kept by her even though they were not owed. Because Keene was not entitled to any of these late fees, the court subtracts $1,000 from the interest owed, resulting in a final obligation of $2,786.99. Because the marital settlement documents and Notes do not contemplate interest accruing on the interest, the court does not award further interest on that amount.

C.    The December 2009 Payment

The evidence supports that Jeffs sent the December 2009 payments to Keene on December

---

[11]    Although the May 2007 payment had been tendered, as discussed above, Widman's payment obligation had not yet been satisfied by July 2007. Accordingly, the court only counts 23 payments rather than 24 payments.

8, 2009 and that they were delivered to the appropriate address on December 10, 2009. As discussed above for the May 2007 payment, this constituted a timely and proper tender by Widman of the December 2009 payment; and therefore, no interest or late fees accrued for that payment.

The evidence is insufficient for the court to make a finding as to whether the checks were actually received by Keene or why Keene failed to deposit the checks. Keene denies receiving them, but Keene's counsel waited until December 31st to notify Widman that Keene had not received the checks. Nevertheless, the evidence is undisputed that upon receiving notice of non-receipt, Jeffs immediately sent replacement checks to satisfy Widman's payment obligation. Due to the late notification, the reissued December payment was not received until January 2010. Keene accepted the reissued checks, deposited them, and they then cleared the bank. Appropriately, no demands were made for late payment fees, interest, or to accelerate the Notes since Widman had timely tendered the December 2009 payments. Based on these facts, the court concludes that Widman complied with her obligations and timely and properly satisfied the December 2009 payment.

**D.      The December 2013 Payment**

By December 2013, this case had been proceeding for approximately four years. Keene had reassigned the Notes to Shell in September 2013 and Widman was again making the payments to Shell. The evidence supports that Widman timely sent and delivered both checks for the December 2013 payment. Shell objected, however, because the check for Mesa Vista was two cents short. Shell demanded that Widman remit the 2¢ difference, pay the $250 late fee, with the additional threat that the Note would be accelerated. At trial, Shell argued for $900,000 accrued interest as well due to the late payment and "default."

"Whether a partial breach of a contract is material depends on the importance or seriousness thereof and the probability of the injured party getting substantial performance." *Brown v. Grimes* (2011) 192 Cal. App. 4th 265, 278 (quotations and citations omitted). The court concludes that shorting the December 2013 payment by 2¢ was not an important or serious breach of Widman's obligations. Moreover, Widman corrected the error upon notification and sent Shell a $250 late payment for that error. This constituted more than substantial performance. Indeed, the court concludes that Shell's demands are further evidence of his failure to act in good faith under the terms of the Notes. The court therefore does not award any interest on this 2¢.

## V.     KEENE'S COUNTERCLAIM

Having addressed Widman's claims for declaratory judgment, the court now addresses Keene's counterclaim.

### A.     Marital Settlement Agreement Claims

In the First, Second, and Third Claims of the Counterclaim, Keene seeks relief for alleged breaches of the Marital Settlement Agreement. In the Sixth Claim Keene seeks a declaratory judgment that Widman is in default of the Marital Settlement Agreement between Widman and Shell. Keene does not hold and never acquired any right to enforce or receive benefits under the Marital Settlement Agreement. Instead, she only received rights under the Notes and Trust Deeds. Because Keene holds no rights under the Marital Settlement Agreement, she lacks standing to assert claims arising from or in connection with the rights and obligations of Widman under the Marital Settlement Agreement.

This fact is not altered by Keene's assignment of her Counterclaim to Shell shortly before

trial. "An assignee stands in the shoes of an assignor, and takes his or her rights from the assignor and is subject to all defenses that are available against the assignor." *Cates v. Chiang* (2013) 213 Cal. App. 4th 791, 825. Because Shell, as an assignee, only acquired the rights that Keene had, he cannot bolster her counterclaim by asserting his independent rights under the Marital Settlement Agreement to nullify Widman's defense to Keene's counterclaim. Keene lacked standing. An assignment cannot alter this fact. Accordingly, the First, Second, Third and Sixth Claims for Relief of the Counterclaim are dismissed with prejudice.

### B. Foreclosure Claims

In Keene's Fourth and Fifth Claim for Relief, she seeks judicial foreclosure of the two properties. As the court has already found, Widman has never been in default under the Notes. Accordingly, there is no ground to foreclose. The court therefore dismisses the Fourth and Fifth with prejudice.

## VI. SHELL'S COMPLAINT

In September 2013, the court denied Shell's request to file a counterclaim due to its untimeliness and prejudice to Widman. When the court denied Shell's request, it stated that any claim Shell believed he had under the Marital Settlement Agreement would have to be filed as an independent action. Shell then filed a Complaint in this district on January 22, 2014 and an Amended Complaint on February 27, 2014 to assert those claims he otherwise would have asserted in his counterclaim.[12] Next, at the Final Pretrial Conference, Shell sought to consolidate the two

---

[12] The Tenth Circuit "look[s] to state law to determine if a claim is a compulsory counterclaim, and if so, the effect of a failure to raise such a claim." *Valley View Angus Ranch, Inc. v. Duke Energy Field Servs.*, 497 F.3d 1096, 1100 (10th Cir. 2007) (citation omitted). While it

matters. The court deferred ruling on his motion until after the trial was completed so it could determine whether any issues remained to be addressed in the parallel action. *See* Order, at 3 (Dkt. No. 145).

Having concluded the trial, the court now determines that consolidation is appropriate because the evidence presented at trial addressed the issues and claims raised in the Amended Complaint. While the Amended Complaint does differ in that it names Jeffs & Jeffs and William Jeffs as parties, evidence was nevertheless received about the facts and claims asserted against them. Therefore, as a matter of judicial economy, the court applies the facts and law from the trial to Shell's Amended Complaint as follows:

### A. Claims Against Widman

#### i. Failure to Perform Claims

Shell asserts in his Amended Complaint that Widman has failed to perform her obligations under the California Judgment. Specifically, Shell seeks declaratory judgment that (1) Widman did not issue the promissory notes; (2) Widman is in contempt because she has not complied with the California Judgment; (3) Widman has made four payments untimely; (4) due to the late payments, Widman owes Shell interest from the inception of the Notes until he assigned them to Keene and then again after Keene reassigned the Notes to Shell; (5) Shell may foreclose on the Green Gables

---

appears that Shell's claim would otherwise have been a compulsory counterclaim, under California law, a defendant does not have to assert such claims until he files an answer. Cal. Code Civ. P. § 426.30(a). Shell failed to file an Answer in this matter until the case was ready for trial. When Shell finally did answer the complaint, the court denied his motion for leave to assert a counterclaim for the reasons stated above. Because the court denied Shell the opportunity to plead a counterclaim, it does not dismiss his Complaint on the basis that his claims are barred.

and Mesa Vista properties; and (6) due to Widman's contempt, Shell requests the court to declare the amount of principal and interest due and owing to Shell, along with any further sanctions that are appropriate.

First, the court has determined that Widman did issue the promissory notes in compliance with the California Judgment. Second, the facts asserted against Widman in the Amended Complaint are the same as those that were presented at trial. Largely, Shell makes his argument as to how the marital settlement documents should be interpreted and the consequences that should flow therefrom. The court, however, has already rejected Shell's proffered interpretation and that ruling is binding on the issues and claims presented in Shell's Amended Complaint. Moreover, the court has determined that Widman has made all required principal and late fee payments to Shell and Keene that were due and owing, and that the only amount now due is $2,786,99 in interest owed to Keene. Because the marital settlement documents and Notes do not contemplate interest accruing upon interest, that amount is fixed. Finally, the court has concluded that Widman has never been in default. Accordingly, the foreclosure asked for by Shell is inappropriate. The court therefore denies Shell's claims for declaratory judgment and hereby dismisses the "failure to perform" claims with prejudice.

ii. <u>Perjury Claim</u>

In addition to addressing the failure to perform claims at trial, the court also received evidence and testimony pertaining to Widman's alleged perjury. Shell asserts that Widman provided false testimony and made fraudulent attempts to transfer ownership of the Mesa Vista and Green Gables property in 2003. It is undisputed, however, that when the parties entered into the Marital

Settlement Agreement in 2005 they agreed to waive all claims for any past wrongs, including fraud. *See* Marital Settlement Agmt., at 10 (Dfts. Ex. 400). Moreover, the Agreement superseded any past agreements by the parties. *Id.* at 19. Accordingly, anything arising from 2003 has been settled and cannot be raised as a claim now.

Next, Shell asserts that on April 16, 2007, "Widman stated, under oath, that she had executed *and recorded* the Promissory Notes and the Trust Deeds," when Widman knew at the time that the promissory notes had never been issued or recorded. Amended Complaint, ¶ 16.b (Dkt. No. 4) (emphasis added). Additionally, Shell asserts that on July 15, 2011, Widman falsely stated, under oath, that she "had prepared, executed and delivered to Shell the required Promissory Notes." *Id.* ¶ 16.c. Shell points out this contradicts her April 2007 statement.

At trial, Shell questioned Widman about her statement that the promissory notes had been recorded. Widman made the statement in a declaration she filed in Sacramento California seeking a protective order to preclude Shell from taking her deposition more than two years after the Marital Settlement Agreement had been entered. *See* Declaration (Dfts Ex. 415). Widman testified at trial that when she made the statement she thought her counsel had recorded the promissory notes. Trial Tr. at 78–81. The court had the opportunity to judge Widman's credibility as she testified on the issue and concludes that Widman did not knowingly make a false statement in her declaration.

Additionally, the Marital Settlement Agreement only requires the Trust Deeds to be recorded in the county where the property is located. *See* Marital Settlement Agmt., at 6 (Dfts. Ex. 400). The Trust Deeds securing the Notes were executed in June 2005 and recorded by the law offices of Jeffs & Jeffs. The copies of the Trust Deed are stamped as having been recorded and Shell admitted at

trial that he received the original recorded Trust Deeds. Trial Tr. at 387–88. This fulfilled Widman's obligation to record documents because, contrary to Shell's contention, Widman was not required to record the promissory notes. Thus, even though Widman did state an incorrect fact about recording the promissory notes, it was not a material fact.

As for the July 15, 2011 statement, the court concludes it was not false because Widman did prepare, execute, and deliver the required promissory notes to Shell. The court therefore concludes that Shell's claim against Widman for perjury lacks merit and is hereby dismissed with prejudice.

### B. Claims Against Jeffs & Jeffs and William Jeffs

#### i. Failure to Make Payment Timely

Shell asserts that William Jeffs and Jeffs & Jeffs (collectively, the "Jeffs Defendants"), acting as Widman's counsel and agent, have failed to make payments to Shell that are required by the California Judgment. Shell seeks declaratory judgment that Jeffs & Jeffs, as an agent for Widman, was responsible for ensuring that Shell and Keene received all payments in a timely manner.

"An agent represents his principal for all purposes within the scope of his actual or ostensible authority, and all the rights and liabilities which would accrue to the agent from transactions within such limit, if they had been entered into on his own account, accrue to the principal." Cal. Civ. Code § 2330. In other words, when an agent acts for his principal, his actions are imputed to the principal. This does not mean, however, that the agent then becomes liable to a third party for the obligations of the principal. Rather, under California law, an agent only becomes liable under limited

circumstances that do not apply in this case.[13] *See* Cal. Civ. Code § 2343.  The court therefore denies declaratory judgment on this ground and dismisses this claim with prejudice.

### ii.  False Statements to the Court

Shell further asserts that Jeffs, individually, as well as Jeffs & Jeffs assisted Widman in making false statements to the court.  Specifically, Jeffs stated in an affidavit that the July 2007 Federal Express package had been properly addressed, when in fact, it had been improperly addressed.  Amended Complaint, ¶ 16.  Shell further alleges the Jeffs defendants engaged in a cover-up by not submitting the Federal Express Airbill with the affidavit.  Shell seeks declaratory judgment that the Jeffs Defendants committed contempt of court for these actions.

At trial, Jeffs explained that he thought the package had been properly addressed.  There is no evidence that Jeffs knowingly made false statements to the court, nor that he engaged in a cover up.  The court finds Jeffs testimony credible and accepts it as true.  Accordingly, the court also denies declaratory judgment on this ground and dismisses this claim with prejudice.

## VII.  ATTORNEYS FEES

Widman prays for attorneys fees incurred in bringing this action.  Under California law attorneys fees may be awarded, with limited exception, only as provided by statute or a contract between the parties.  According to the Marital Settlement Agreement, the parties agreed that the

---

[13]  The evidence at trial shows that Widman timely provided funds to Jeffs & Jeffs to make the payments to Shell and that whenever a late fee was remitted, Widman did not provide additional funds to Jeffs & Jeffs to make those late fee payments.  While Jeffs & Jeffs may have undertaken the obligation to pay the late fees, that obligation existed between Widman and Jeffs & Jeffs, with approval and or ratification by Widman.  At no time did Jeffs & Jeffs indicate to Shell that obligation flowed to him.  Thus, whether the funds came from Widman or from Jeffs & Jeffs on behalf of Widman, the effect was the same and did not give rise to a duty to Shell.

"court may award attorney's fees and costs to any Party it determines to be the prevailing party." Marital Settlement Agmt., at 15 (Dfts. Ex. 400).

In this case, both Keene and Shell asserted that Widman was in default, that payments had not been timely made, and that interest and late fee payments were due under the Trust Deed Notes. After repeated disputes over these issues for several years, Widman brought suit to resolve the issues and to have the court declare that she had met her obligations under the Trust Deed Notes. The court concludes that Widman is the prevailing party. Moreover, based on the facts of this case, the court concludes that attorney fees and costs are warranted in favor of Widman. Because attorney fees and costs are contemplated not only under the Marital Settlement Agreement, but also the Notes that were assigned to Keene, the court concludes that Keene and Shell are jointly and severally liable for a reasonable attorneys fee and costs.

## DECLARATORY JUDGMENT AND ORDER

For the reasons stated above, the court hereby enters Declaratory Judgement and Orders as follows:

(1)     Widman has made all payments required by the marital settlement documents and Trust Deed Notes from July 2005 through the trial in April 2014.

(2)     Widman is not in default, and has never been in default, under the marital settlement documents and Trust Deed Notes. Consequently, the principal balance on those Notes has not been accelerated and is therefore not due and owing in full at this time.

(3)     Keene was the holder of the Mesa Vista Trust Deed Note from October 31, 2006 to

September 11, 2013. With the exception of the July 2007 payment, Widman timely made all payments to Keene that were legally required to be made under the Mesa Vista Note during that period, including any required late fee payments.

(4)     Keene was the holder of the Green Gables Trust Deed Note from November 17, 2006 to September 11, 2013. With the exception of the July 2007 payment, Widman timely made all payments to Keene that were legally required to be made under the Green Gables Note during that period, including any required late fee payment.

(5)     Because the July 2007 payment was late, Widman paid Keene $500 in late fees for that month. Additionally, interest accrued from July 1, 2007 until July 19, 2007 when payment was made. The total interest that accrued was $3,786.99. This amount is offset by $1,000 in late fees that Widman paid to Keene in May 2007 and August 2008 that were not due and owing. Accordingly, Widman owes Keene **$2,786.99**, which amount shall be paid **on or before September 5, 2014** via wire transfer to Keene. Keene is ordered to cooperate in providing all necessary information to Widman's counsel to complete the wire transfer. Widman owes no further interest on any principal to Keene. Additionally, Widman has satisfied any late fees that she owed on the Trust Deed Notes and owes no further late fees to Keene.

(6)     Keene re-assigned the Green Gables and Mesa Vista Trust Deed Notes to Shell on September 11, 2013 and Shell is the present holder of those Notes. All payments required to be made to Shell under the Notes before their assignment to Keene and after the re-assignment back to Shell on September 11, 2013 have been made. Widman owes no interest or further late fees to Shell.

(7)     As of the trial in April 2014, Widman had paid $353,334.04 on the Green Gables

Trust Deed Note. The remaining balance due and owing to Shell, as of April 2014, on that Note is $46,665.96. This figure credits the April 2014 as having been paid.

(8)     As of the trial in April 2014, Widman has paid $441,665.96 on the Mesa Vista Trust Deed Note. The remaining balance due and owing to Shell on that Note, as of April 2014, is $58,334.04. This figure credits the April 2014 as having been paid.

(9)     Counterclaim plaintiff Keene's counterclaim against counterclaim defendant Widman is denied and dismissed with prejudice and judgement entered in favor of Widman.

(10)     Having found that the issues and claims tried in this matter are the same as those raised in the case of *Shell v. Widman*, 2:14-cv-43, the court GRANTS Shell's motion to consolidate that case into the present one, and hereby dismisses with prejudice all claims asserted in the Amended Complaint.

(11)     Widman is the prevailing party in this action and shall recover jointly and severally from Keene and Shell a reasonable attorney fee and costs as allowed by law. Within 30 days of the entry of this order, Widman shall file a request for the amount of a reasonable attorney fee that complies with local rules, together with the required support, and a bill of costs. Any objection by Keene or Shell must be filed within 30 days after Widman files her request.

DATED this 19th day of August, 2014.

BY THE COURT:

Clark Waddoups
United States District Judge